768 So.2d 514 (2000)
Gary KROITZSCH and Sherrilyn Kroitzsch, Appellants/Cross-Appellees,
v.
D. Bruce STEELE and Thomas G. Sjursen, Appellees/Cross-Appellants.
No. 2D99-3229.
District Court of Appeal of Florida, Second District.
September 6, 2000.
*515 R. Nathan Hightower of MacFarlane Ferguson & McMullen, Clearwater, for Appellants/Cross-Appellees.
Walter E. Smith of Meros, Smith & Olney, P.A., St. Petersburg, for Appellees/Cross-Appellants.
PARKER, Acting Chief Judge.
Gary and Sherrilyn Kroitzsch (the Tenants) appeal the portion of the amended final judgment which ordered them to vacate a residence in Safety Harbor. D. Bruce Steele and Thomas G. Sjursen (the Buyers) appeal the portion of the amended final judgment which denied their claims for rent. We reverse the order of eviction, rendering the claims for rent moot.
The following evidence was adduced during a bench trial. The Tenants bought their home in 1973, and have lived in the home exclusively and continually during the last twenty-seven years. In 1990, as a result of the Tenants' financial difficulties, a mortgage foreclosure action was filed seeking the judicial sale of the home. The Tenants filed a bankruptcy petition during the pendency of the foreclosure action, but the court entered summary final judgment for foreclosure in favor of the mortgagee, Home Savings of America, F.A. (Home Savings). As a result of this judgment, a judicial sale of the property occurred in 1992, with a certificate of sale and certificate of title issued to Home Savings. Home Savings subsequently conveyed title to the property to the Federal National Mortgage Association (FNMA).
In order to obtain possession of the residence from the Tenants, Home Savings caused to have issued a writ of possession in 1992. Contemporaneous with this event, the Tenants settled an unrelated lawsuit with a physician for $50,000. Thereafter, the Tenants negotiated with FNMA for the repurchase of their home, in which they were still living, utilizing the funds from the settlement. Mr. Kroitzsch testified that, because the sales price was less than the debt previously owed under the mortgage foreclosure, the Tenants were advised that a party with a different name should repurchase the residence. Mr. Kroitzsch contacted his stepfather, Robert Varner, who agreed to submit a contract to FNMA in his name and purchase the residence using the Tenants' settlement funds. Although Mr. Kroitzsch admitted that he believed that a federal tax lien which was pending against him would have attached to the property if title were in his name, Mr. Kroitzsch asserted that the lien did not influence his decision to have Varner purchase the residence. Arrangements were hastily made between the Tenants' attorney, the title company, and Varner, resulting in the conveyance of the home by FNMA to Varner in June 1992 by special warranty deed.
Varner thereafter advised Mr. Kroitzsch that Varner needed a lease for "tax purposes," and Mr. Kroitzsch signed the lease agreement as a favor to Varner. The lease extended for one year commencing July 13, 1992, and provided for rent in the amount of $600 per month. Paragraph 17 *516 of the lease reads, in pertinent part: "Should Lessee remain in possession of the demised premises with the consent of Lessor after the natural expiration of this lease, a new month-to-month tenancy shall be created between Lessor and Lessee which shall be subject to all terms and conditions hereof...." Paragraph 21 provides: "The covenants and conditions herein contained shall apply to and bind the heirs, legal representatives and assigns of the parties hereto...." Mrs. Kroitzsch did not sign the lease, the lease was not witnessed, and neither rent nor a security deposit was ever requested by Varner or paid by the Tenants. After the lease was executed, Varner paid the ad valorem taxes annually. The Tenants no longer insured the property and continued to reside in the residence.
In the latter part of 1996, Varner went to Sunshine Family R.V., Inc. (Sunshine Family), shopping for a recreational vehicle (RV). During several return trips, Varner negotiated for the purchase of an RV with Steele, who was a principal of Sunshine Family, and Sjursen, who was a friend of Steele's. Varner eventually entered into a contract with Steele and Sjursen, the Buyers, which provided for the sale of the Tenants' residence to the Buyers in exchange for an RV and $37,500.
During the negotiations leading to the execution of the contracts, and between the date of execution and the closing, Varner advised the Buyers that the home was occupied by the Tenants and provided the Buyers with a copy of the lease. Varner explained to the Buyers that the Tenants were in arrears on rent, and the Buyers agreed that Varner would take the necessary steps to remove the Tenants from possession and that the mortgage payments would not start until the Tenants' possession was terminated. Neither of the Buyers inquired as to how much rent was due, as to why the lease was for only one year, or as to why Varner had to take action to regain possession. Prior to the closing, the Buyers checked the courthouse records, which showed that Varner was the owner of the property, and obtained title insurance which did not cover "[r]ights or claims of parties in possession not shown by the public records." The Buyers also drove by the home on more than one occasion, noting that the home was being occupied.
The Buyers' closing statement contained no proration for rent due from any tenant. Sixteen days after the closing, Varner executed an affidavit of no liens, which provided: "The affiant is in full and exclusive constructive or actual possession of the above described premises and has no knowledge of any claim or assertion of title to those premises, other than: the interest of a tenant, GARY KROITZSCH." Neither the Buyers nor anyone acting on their behalf contacted the Tenants until long after the closing on the purchase of the residence from Varner.
In January 1997, Varner delivered to the Tenants a three-day eviction notice, alleging rent due in the amount of $33,000. Varner took no further action regarding possession of the residence, and the Tenants remained in the residence. The Buyers, after waiting almost six months, served another three-day notice letter. When the Tenants refused to vacate, the Buyers filed a complaint and amended complaint for eviction against the Tenants and added additional counts to recover rent and for trespass.[1]
The trial court entered an amended final judgment granting the Buyers' eviction claim and denying the Buyers' claim for unpaid rents and trespass. The final judgment contained the following findings:
2. The Defendant, Gary Kroitzsch, admitted that he had engaged in a purposeful plan to have the record title to the property placed in his father-in-law's name rather than his *517 own, he continued to allow the property to remain this way for a period of years making no attempt to record any evidence of his purported ownership interest or to alter the title.
3. The Defendant, Gary Kroitzsch, asserts that he did not engage in this course of conduct as part of a scheme to avoid creditors, yet his testimony reveals that he believed the Federal Tax Lien pending against him would have attached to property such as the home put in his name.
. . . .
5. With the aforementioned facts presented the Defendant wants to assert the Plaintiffs were or should have been on notice of his interest in the property purely on the basis that he was living in the home and they were aware of it. This Court is very skeptical of the proposition that knowledge of possession constitutes notice sufficient to require the buyer to contact those in possession. It may indeed be a factor which would require some reasonable inquiry and in this case the Plaintiffs did make efforts to determine the facts. The Seller's explanations regarding the occupants [sic] status were reasonable, particularly in light of the "false lease" which was created in part by the Defendant's own signature.
Like the trial court, we question the motives of the Tenants in this repurchase/lease arrangement with this property. However, the first hurdle this court must address is the reasonable inquiry the Buyers were required to make to assert a superior ownership interest in the property.
It is a basic tenet of property law that successors to legal title take title subject to those equitable interests of which they have notice. See Hoyt v. Evans, 91 Fla. 1053, 1055, 109 So. 311, 311 (1926). Actual possession is constructive notice to all the world or anyone having knowledge of said possession of whatever rights the occupants have in the land. Such possession when open, visible, and exclusive, will put upon inquiry those acquiring any title to or a lien upon the land so occupied to ascertain the nature of the rights the occupants really have in the premises.
Lee County Bank v. Metropolitan Life Ins. Co., 126 So.2d 589, 592 (Fla. 2d DCA 1961) (quoting Carolina Portland Cement Co. v. Roper, 68 Fla. 299, 303, 67 So. 115, 116 (1914)).
Volume 77 of American Jurisprudence Second, Vendor and Purchaser, § 473 provides:
Generally, possession of real estate is not notice of a claim not asserted, and if proper inquiry is made, and information concerning the rights of the possessor is withheld or concealed, possession will be notice only of the fact of possession and not of the rights of the possessor so concealed. The investigation should, however, be a reasonable one. The inquiry should be made directly of the person in possession, since such person is the one interested and from whom the proper information will be acquired; it is insufficient to make the inquiry as to the possessor's right from the vendor whose interest it is to conceal the true state of facts, and it is likewise insufficient to inquire merely of persons living in the neighborhood.

(Emphasis added). See also Bright v. Buckman, 39 F. 243, 244 (N.D.Fla.1889); Humble Oil & Ref. Co. v. Laws, 272 So.2d 841 (Fla. 1st DCA 1973).
In Humble Oil, a prospective purchaser contracted to purchase an oil, gas, and mineral lease with the record owners of a property inhabited by tenants who had executed an unrecorded contract for sale of the property and rights with the record owners. See 272 So.2d at 842. During negotiations with the prospective purchaser, *518 the record owner remarked that she did not think she owned any mineral rights. The prospective purchaser observed that the property in question was inhabited and being cultivated, but ended his inquiry into the tenants' rights with a record search. The First District affirmed the trial court's determination that the tenants' possession put the prospective purchaser on notice of their interest in the land. Id. at 842-43. The court explained:
[The] prospective purchaser, having knowledge of the possession of the realty by the ... lessees, was required to inquire as to the full terms and conditions of their lease, including their right to purchase.... [The prospective purchaser] did not visit the property or make any inquiry other than as reflected by the courthouse records.
Id.
In this case, it is undisputed that the Buyers checked the official property records at the courthouse, obtained a copy of the purported lease between Varner and the Tenants, obtained title insurance, and drove by the property to ascertain that the residence was occupied. The question for this court to resolve is whether those actions constituted reasonable inquiry. We conclude that there were sufficient red flags raised in this residential purchase to require further inquiry by the Buyers.
The one-year lease agreement Varner showed to the Buyers was dated July 1992, signed by Mr. Kroitzsch only, and had not been witnessed. Although Varner represented that the Tenants were past due on the rent, the Buyers did not obtain an estoppel letter from the Tenants prior to the closing. Additionally, the Buyers never inquired about the amount of rent claimed to be unpaid, and the closing statement for the purchase of the property contained no proration of rent.
The Buyers drove by the property to ascertain that the residence was occupied, but made no effort to contact the Tenants to ascertain their interests in the property. In fact, the Buyers made no contact with the Tenants at all until months after their purchase of the residence from Varner. The Buyers did not rely upon an affidavit of Varner as to the Tenants' possessory interest at closing, as the affidavit was executed by Varner sixteen days after the closing. Finally, it is true that the Buyers bought an owner's title insurance policy, but that policy did not protect against the rights of parties in possession.
The Buyers relied solely upon the public records, a questionable residential lease agreement, and the representations of the seller in ascertaining the Tenants' rights to the property. Like the prospective purchaser in Humble Oil, the Buyers failed to make any inquiry with the Tenants as to their rights in the property. We agree with the First District that such actions are necessary in cases where red flags are raised in determining the property rights of record owners who have tenants, as here. Because we conclude that the Buyers did not conduct a reasonable inquiry into the status of the Tenants' possible interest in this property, we reverse the order requiring the Tenants to vacate the property and remand for further proceedings in the trial court.
Reversed and remanded.
NORTHCUTT, J., and HAYES, HUGH D., Associate Judge, Concur.
NOTES
[1] A subsequent amended complaint adding a count for breach of contract against Varner resulted in a default in favor of the Buyers against Varner.